MONARCH PORTLAND CEMENT COMPANY, APPELLANT, V.
P. J. CREEDON & SONS, APPELLEE.

FILED JUNE 26, 1913. No. 17,317.

1. **Corporations: CONTRACTS: AUTHORITY OF MANAGER.** "The manager of sales of a manufacturing corporation has power to direct and contract in regard to the usual running business of selling its wares, and persons contracting with such corporation are not bound to know of a by-law thereof limiting the power of such manager to make the customary contracts." *Barber v. Stromberg-Carlson Telephone Mfg. Co.*, 81 Neb. 517.

2. **Sales: ACCEPTANCE.** Where a contract prepared by a local sales agent is drawn up in the presence of the general sales manager of a corporation, and, after being signed by the buyer and by the local sales agent on behalf of the seller, is presented to the general sales manager for approval, a telegraphic direction by him to the home office to ship a part of the goods, and the shipment and receipt by the buyer of the goods shipped, constitutes such an acceptance of the contract as to make the seller liable for a failure to deliver the remainder of the goods according to contract.

3. ——: ——. The fact that at the time goods were shipped by other officers of the corporation in response to a telegram from the sales manager such officers were not aware that a written contract had been entered into between the parties is not material in an action for damages for breach of contract.

4. ——: CONTRACT: RATIFICATION. Evidence examined, and *held* to establish the ratification and approval of the written contract between the parties by the general sales manager of plaintiff.

APPEAL from the district court for Douglas county: WILLIS G. SEARS, JUDGE. *Affirmed.*

*Switzler, Goss & Switzler*, for appellant.

*Smyth, Smith & Schall, contra.*

LETTON, J.

Since the defendant concedes that the statement of the case made by the plaintiff in its brief fairly presents the

questions involved, we adopt it as a statement of the facts. The plaintiff, the Monarch Portland Cement Company, manufacturers of cement at Humboldt, Kansas, sued the defendant, P. J. Creedon & Sons, for five cars of cement shipped March 31 to April 8, 1910. The conceded net amount due on these five cars, after proper credits for freight and sacks returned, was the sum of $480, and was so allowed at the trial. The defendant counterclaimed for damages for breach of a written contract which provided for the purchase of a minimum of 12,500 barrels and a maximum of 25,000 barrels to be delivered between the date of the contract, March 31, 1910, and December 31, 1910. A copy of the contract is attached to the answer, also exhibit 1. The court in its instructions fixed the amount of plaintiff's claim at $480, and limited defendant's counterclaim to the minimum quantity of 12,500 barrels and damages of $2,390, and told the jury, if they found for the defendant, the verdict should be for $1,925, which amount they so found and for which judgment was entered.

The main controversy is over the validity of the contract. It was made for the plaintiff by one Hickey of Omaha, who held a written contract, which is in evidence, and which gave him certain limited powers, and was executed for defendant by W. J. Creedon, an officer of defendant company. Defendant's contenti was that this contract was approved and ratified at Omaha by S. D. Crozier, the sales manager of plaintiff. The plaintiff denies the alleged approval, and the dispute on this point forms the main controverted point in the case. The defendant's contention was that Crozier, the sales manager of plaintiff, was shown the contract, and that, while he declined to sign the blank provided for its approval, he stated to Creedon that it was not necessary, and that the telegraphic order he then and there sent for five cars "would start the contract to going." Plaintiff's claim is that Crozier had no authority to approve it, declined so to do, that he agreed only to submit it, and a week later when he did submit it

to the executive officers at Humboldt they refused it, and that the ordering of the five cars was to supply an immediate want unconnected with the contract.

The first contention of plaintiff is that the verdict is not sustained by the evidence. In February, 1910, Mr. Hickey, the Nebraska sales agent, Mr. Peters, who was also in the employment of the plaintiff, apparently as a special agent or salesman, and Mr. Crozier, the sales manager of the plaintiff, were together in Omaha, and had some conversation with Mr. Creedon with reference to a purchase of cement by him from the Monarch company. Apparently nothing definite was accomplished at this time, but on or about the 31st of March, 1910, Crozier and Peters went to Omaha and met Mr. Hickey at the office of the Power-Heafy Coal Company. Crozier testifies he went to Omaha on receipt of a telegram, that he consulted Mr. Connet, the president of the company, and decided he ought to go. Crozier and Hickey discussed the matter of a contract with defendant, and Hickey prepared a contract in triplicate and passed it to Mr. Crozier for his examination, who said he did not believe Creedon would sign it, but suggested no changes. Mr. Peters says that at this time Crozier discussed the terms of the contract with Hickey, and that it was partly reduced to writing when he left the room. Later in the day Mr. Hickey telephoned to Creedon, and Creedon went to Hickey's office, where he found Hickey with the contract all drawn up, except the signatures. Hickey then signed it for the Monarch company and Creedon for the defendant. After signing, Hickey took the contract, and they both went from there to the Henshaw hotel at Hickey's suggestion that they go and talk the matter over with Mr. Crozier. They found Crozier and Peters at the hotel. Creedon testified that Hickey produced the contract, and Creedon stated, "Here is the contract with our signatures," and asked him to approve it. Crozier said it was unnecessary for him to sign, and asked for an order for five cars of cement, saying: "We have entered into this contract now and we desire to

start it at once to conform with the terms of the contract. I will wire in an order." Hickey, Creedon and Peters practically agree that Crozier took the contract and asked Creedon how much cement he could take to start the contract; that Creedon authorized the shipment of five cars of 100 barrels each, and that Crozier then wrote a telegram instructing the shipment of five cars. He told Creedon that perhaps the shipment would be invoiced to him at a higher price, but he would be back in Humboldt in a few days, and if it was he would have it fixed. Crozier took two copies and Creedon retained one. The essential part of the written contract is as follows:

"That the party of the first part hereby sells and agrees to ship and the party of the second part purchases and agrees to receive a minimum of 12,500 and a maximum of 25,000 barrels of Monarch Brand Portland Cement, to be shipped the party of the second part at a maximum price of 80 cents per barrel f. o. b. cars at Humboldt, Kan., with the further understanding that, if at any time during the life of this contract Kansas Gas Belt current list price should be lower than the above figure, then during such time as such reduction exists the price on shipments made to the party of the second part during said period shall be reduced to current figure in effect. * * * It is further understood that party of the second part shall begin ordering said cement at once, and that shipments shall be distributed as equally as possible between the months covered in this contract, approximating a minimum of 1,500 and a maximum of 3,000 barrels monthly, with the further understanding that the party of the first part shall not be obliged to ship over 5,000 barrels in any one month. * * * This contract to remain in full force and effect subject to above contingencies from April 1st, A. D., 1910, to December 31st, A. D., 1910. In token of our acceptance hereof, witness our hands this 31st day of March, A. D. 1910, same being affixed by our duly authorized representatives. Monarch Portland Cement Company, by E. G. Hickey, Nebr. Sales Agt. Approved P. J. Creedon & Sons.

by W. J. Creedon, Secy. & Treas.   Monarch Portland Cement Company by ———.''

The telegram is as follows: "Omaha 3-31-1910.  To Monarch Portland Cement Co., Humboldt, Kansas.   Ship P. J. Creedon & Sons, Omaha, one car today sure; allow four more hundred barrel cars to follow *via* Mo. Pac.  S. D. Crozier."

The first communication received by Creedon from the Monarch company was as follows: "The Monarch Portland Cement Co.  Humboldt, Kans., March 31, 1910. Creedon & Sons, Omaha, Nebr.  Gentlemen: We have received today a telegram from our Mr. Crozier, to ship you one car Monarch cement today sure, and allow four more 100 barrel cars to follow *via* Missouri Pacific, and we are sending you today one 150 barrel car and will give the rest of the order our prompt attention.  Trusting this is satisfactory, we are, Yours very truly, The Monarch Portland Cement Co.  S. D. Crozier, Sales Manager."

Defendant received 550 barrels of cement within a few weeks afterward, billed to it at 80 cents a barrel, which was the contract price.   On April 26 the Monarch company was directed by letter to ship one car of cement a day on the contract until further notice.   On April 28 the Monarch company acknowledged receipt of the order of one car a day, but stated that the price was now $1 f. o. b. Humboldt, or $1.10 f. o. b. Iola, Kansas, and refused to ship cement under the contract.   Creedon also testified that in May he was told by Mr. Keith, the secretary of the Monarch company, that the contract had not been approved by the company, and cement had advanced, and therefore he would not ship under the contract.   Crozier testified that, when the contract was shown to him at the hotel, he told Creedon that plaintiff could not accept it because it did not conform to the original contract with Mr. Hickey, but that he was willing to submit it to Mr. Connet, the president of the company, but was sure it would not be accepted; Creedon said he was out of cement and wanted five cars at once; Hickey and Creedon were trying to write

a telegram, that they showed it to him, and that he re-wrote it, saying at the time that these five cars were to be shipped without having any relation to any contract; that in about a week he took the contract to Humboldt and showed it to Connet, and returned it to Hickey revised in accordance with their contract with Hickey. The president and secretary of the company both testified that, when the five cars were shipped, they did not know of the Creedon contract. Creedon and Hickey both deny specifically that Crozier said the contract would not be accepted because it did not conform to the Hickey contract; that he would submit it to Connet, but that he did not think it would be approved; and that Crozier said the five cars would be shipped without any relation to the contract.

We are convinced from the evidence that Mr. Crozier as sales manager of the Monarch company had power to enter into or to approve and ratify this contract. Why constitute such an officer and at the same time bind him by secret limitations on his authority? In fact, the question of his authority does not seem to be very material, because it appears to be conceded that if Crozier had approved the contract at the meeting his action would have bound the principal, and this was really the main issue in the case. In *Barber v. Stromberg-Carlson Telephone Mfg. Co.,* 81 Neb. 517, we said: "The manager of sales of a manufacturing corporation has power to direct and contract in regard to the usual running business of selling its wares, and persons contracting with such corporation are not bound to know a by-law thereof limiting the power of such manager to make the customary contracts."

We are convinced that Crozier not only had ostensible authority to make or approve this contract, but had actual authority so to do. The real inquiry is whether the evidence is sufficient to sustain the verdict. The jury were amply justified in believing Hickey, Creedon and Peters with respect to the conversation at the hotel as against Crozier, and, when we take into consideration the further fact that Crozier was cognizant of and took part in the

preparation of the written document before Creedon ever saw it, the story of these witnesses seems to be fully corroborated. The fact that the other officers of plaintiff had no knowledge of the specific terms of this contract when the telegram ordering the five cars was received is not essential to its validity. Crozier had authority to ratify the contract, his acceptance of it and direction to ship the goods was a sufficient approval and ratification on the part of the corporation.

The contention is made that the court erred in excluding evidence that new contracts were sent to Hickey about April 8, and that he so informed Creedon. It is said that this was important to go to the jury, especially in view of the fact that it was nearly a month after the meeting at the hotel before Creedon ordered any more cement. The only possible effect this evidence could have would be to show that, when the terms of the contract were brought to the attention of the other officers of the plaintiff company, they did not approve them and desired to change them. This had already been testified to directly, could throw no light upon what actually occurred at the hotel, and was immaterial.

The case is not one, as suggested by the plaintiff, where one party to a proffered contract, required by the statute of frauds to be in writing, can make that contract binding by his own verbal testimony to its acceptance; but, as we view the testimony, it is one where a written contract was prepared and signed by a local sales agent under the authority and by the direction of the general sales manager of a corporation, and by the purchaser, and when presented to the sales manager for approval was ratified by him, by accepting the contract, ordering from his principal and delivering goods under its terms.

We find no prejudicial error in the record, and the judgment of the district court is

AFFIRMED.


ROSE, SEDGWICK and HAMER, JJ., not sitting.